*copy*

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the

United States of America )
v. )
)
) Case No. **19-29256-CMG**
)
)
**Denise Carlon** )
_Defendant(s)_ )

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **3/5/2020** in the county of **Mercer** in the

_____ District of **New Jersey** , the defendant(s) violated:

_Code Section_                                   _Offense Description_

**Please see the attached affidavit**            **Please see the attached affidavit**

This criminal complaint is based on these facts:

**Please see the attached affidavit**

SHAFIA QAMAR
Notary Public, State of New Jersey
My Commission Expires Jan 25, 2026

12/2/22

This notary is only for
Reza Farzan.

☒ Continued on the attached sheet.

_Complainant's signature_

**Reza Farzan**
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____

_Judge's signature_

City and state: _____

_Printed name and title_

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. **19-29256-CMG** |
| | ) | |
| | ) | |
| | ) | |
| **Jenelle C. Arnold** | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __3/5/2020__ in the county of __Mercer__ in the

_____ District of __New Jersey__ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| **Please see the attached affidavit** | **Please see the attached affidavit** |

This criminal complaint is based on these facts:

**Please see the attached affidavit**

☒ Continued on the attached sheet.

SHAFIA QAMAR
Notary Public, State of New Jersey
My Commission Expires Jan 25, 2026

12/2/22

This notary is only For
Reza Farzan.

_Complainant's signature_

**Reza Farzan**

_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____

_Judge's signature_

City and state: _____

_Printed name and title_

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003. All rights reserved.

Return To:

AMERICAN MORTGAGE NETWORK, INC.
P. O. BOX 85463
SAN DIEGO, CALIFORNIA 92186

Prepared By:        RECORD & RETURN
STEFANIE HUBER
                    Premier Abstract & Title Agency, Inc.
                    1006 Eastpark Boulevard
                    Cranbury, New Jersey 08512

FEB 17 2005

─────[Space Above This Line For Recording Data]─────

# MORTGAGE

MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    FEBRUARY 14, 2005
together with all Riders to this document.
(B) "Borrower" is

    REZA FARZAN

TOTAL                    $220.00
FEES
COUNTY RECORDING  $220.00
Total Pages: 20
PAGE: 1637
BOOK: OR-8443
8:10:52 AM
Mar 08, 2005
RECORDED ON
2005035713
INSTRUMENT NUMBER
M CLAIRE FRENCH,CTY CLK
MONMOUTH COUNTY,NJ

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3031 1/01

VMP -6A(NJ) (0005)
Page 1 of 15

VMP MORTGAGE FORMS - (800)521-7291

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003. All rights reserved.

(D) "Lender" is    AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION

Lender is a    CORPORATION
organized and existing under the laws of    THE STATE OF DELAWARE
Lender's address is  P. O. BOX 85463, SAN DIEGO, CA 92186

(E) "Note" means the promissory note signed by Borrower and dated   FEBRUARY 14, 2005
The Note states that Borrower owes Lender    THREE HUNDRED FIFTY NINE THOUSAND SIX
HUNDRED FIFTY AND 00/100                                      Dollars
(U.S. $       359,650.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than      MARCH 01, 2035
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

-6A(NJ) (0005)                    Page 2 of 15                                    Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the COUNTY                    of                    MONMOUTH                    :

        [Type of Recording Jurisdiction]             [Name of Recording Jurisdiction]

SEE ATTACHED LEGAL DESCRIPTION "EXHIBIT A"

Property Account Number:    LOT 30 BLOCK 58.04         which currently has the address of
                       23 TWIN TERRACE                      [Street]
                       HOLMDEL        [City], New Jersey   07733   [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

-6A(NJ) (0005)                Page 3 of 18                    Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2002, All rights reserved.

# SCHEDULE A
## DESCRIPTION

ORIGINAL DOCUMENT POOR QUALITY

**Application No.:** ▇▇▇▇▇▇

ALL that certain lot, parcel or tract of land, situate and lying in the Township of Holmdel, County of Monmouth and State of New Jersey being more particularly described as follows:

BEING known and designated as Lot 30 in Block 58.04 as shown on map entitled *"Final Subdivision Plat Twin Acres Section Five"* duly filed in the Monmouth Clerk's/Register's Office on August 5, 1985 as Case No. 201-23.

Being further and more particularly bound and described as follows:

BEGINNING at a point in the Northerly sideline of Twin Terrace (50' ROW), said point being the Southerly most corner of Lot 31 in Block 58.04 as shown on map entitled *"Final Subdivision Plat Twin Acres Section Five"* duly filed in the Monmouth Clerk's/Register's Office on August 5, 1985 as Case No. 201-23; from thence running

(1)  North 14 degrees 41 minutes 40 seconds East, 82.62 feet to a point; thence

(3)  South 73 degrees 35 minutes 04 seconds East, 128.133 feet to a point in the Westerly sideline of Prospect Street; thence

(4)  Southwesterly, along the same, on a curve to the right having a radius of 312.82 feet, an arc length of 41.22 feet to a point of tangency therein; thence

(5)  Along the same, South 23 degrees 09 minutes 33 seconds West, 40.70 feet to a point of curvature; thence

(6)  Southwesterly, on a curve to the right having a radius of 15.00 feet, an arc length of 23.56 feet to a point in the Northerly sideline of Twin Terrace; thence

(7)  Along the same, North 66 degrees 50 minutes 27 seconds West, 103.00 feet to the point and place of BEGINNING.

FOR INFORMATIONAL PURPOSES ONLY:
Being commonly known as Lot 30, Block 58.04 on the Tax Map of the Township of Holmdel.

The above description was drawn in accordance with a survey prepared by DSV & Associates, dated January 20, 2005.

*THIS IS A REVISED DESCRIPTION DATED January 21, 2005. THIS DESCRIPTION MUST BE USED IN THE PREPARATION OF ALL DOCUMENTS.*

PREMIER ABSTRACT & TITLE AGENCY, INC. ISSUED BY                    PHONE: (609) 860-1000
AGENT FOR OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY            FAX: (609) 860-1001

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003. All rights reserved.

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*)- Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 14TH   day of    FEBRUARY 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to   AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION

("Lender") of the same date and covering the property described in the Security Instrument and located at:
23 TWIN TERRACE, HOLMDEL, NJ, 07733
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of      5.750    %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of    MARCH 2010      , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family - Fannie Mae Uniform Instrument**
(VMP)-168R (0401)  Form 3187 6/01
Page 1 of 4
    VMP Mortgage Solutions
      (800)521-7291

370ST

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2008, All rights reserved.

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000                         percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.750 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

---

VMP-168R (0401)                    Page 2 of 4                    Form 3187 6/01

---

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003. All rights reserved.

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

VMP®-168R (0401)                    Page 3 of 4                    Form 3187 6/01

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.

which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
-Borrower

_____ (Seal)
REZA FARZAN    -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

-168R (0401)          Page 4 of 4          Form 3187 6/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

VMP®-6A(NJ) (0005)                    Page 4 of 16                    Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(NJ) (0005)                          Page 5 of 15                              Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

VMP®-6A(NJ) (0008)    Page 6 of 16    Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-BA(NJ) (0005)                    Page 7 of 15                    *RP*                    Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6A(NJ) (0005)                    Page 8 of 16                    Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

-6A(NJ) (0005)    Page 9 of 15    Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(NJ) (0005)                    Page 10 of 15                                    Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

-6A(NJ) (0005)                    Page 11 of 15                                   Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

VMP -6A(NJ) (0005)                  Page 12 of 16                        Form 3031 1/01

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003. All rights reserved.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____                _____ (Seal)
                                                REZA FARZAN                      -Borrower

DANIELLE FALLON
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR. 5, 2008

_____ (Seal)         _____ (Seal)
                         -Borrower                                               -Borrower


_____ (Seal)         _____ (Seal)
                         -Borrower                                               -Borrower


_____ (Seal)         _____ (Seal)
                         -Borrower                                               -Borrower


_____ (Seal)         _____ (Seal)
                         -Borrower                                               -Borrower



VMP-6A(NJ) (0005)                    Page 14 of 15                    Form 3031 1/01

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.

STATE OF NEW JERSEY,  *Monmouth*                              County ss:

On this  14th  day of *February, 2009*              , before me, the subscriber,
personally appeared

*Reza Farzan*

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

*Danielle Fallon*

Notary Public

DANIELLE FALLON
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR. 5, 2008

-6A(NJ) (0005)                    Page 16 of 16                           Form 3031 1/01

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved

Record and Return to:

FEIN, SUCH, KAHN & SHEPARD, PC.
7 Century Drive - Suite 201
Parsippany, New Jersey 07054
(973) 538-9300
Our File No.

MAR 1 6 2009

### ASSIGNMENT OF MORTGAGE

ZCH1523
**KNOW ALL MEN BY THESE PRESENTS:**

It is on this 27th day of February, 2009, that MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR AMERICAN MORTGAGE NETWORK, INC. herein designated as the Assignor, for and in consideration of the sum of ONE and 00/100 ($1.00) DOLLAR and other good and valuable consideration, the receipt whereof is hereby acknowledged, does by these presents assign to CHASE HOME FINANCE LLC residing or located at 3415 VISION DRIVE, COLUMBUS, OH 43219, herein designated as the Assignee, a certain Mortgage dated February 14, 2005, made by REZA FARZAN on lands located in the TOWNSHIP OF HOLMDEL in the County of MONMOUTH and State of New Jersey, to secure payment of the sum of $359,650.00 which mortgage is recorded or registered in the Clerk/Register's Office of the County of MONMOUTH, recorded on March 8, 2005 in Book 8443 of Mortgages on Page 1637.

TOGETHER with the Bond, Note or other Obligation therein described, and the money due and to grow due thereon, with the interest. TO HAVE AND TO HOLD the same unto the said Assignee forever, subject only to all the provisions contained the said Mortgage and the Bond, Note or other Obligation.

AND the said Assignor hereby constitutes and appoints the Assignee as the Assignor's true and lawful attorney, irrevocable in law or in equity, in the Assignor's name, place and stead but at the Assignee's cost and expense, to have, use and take all lawful ways and means for the recovery of all the said money and interest; and in case of payment, to discharge the same as fully as the Assignor might or could do if these presents were not made.

In all references herein to any parties, persons, entities or corporations the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.

IN WITNESS WHEREOF, the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper corporate officers and its corporate seal to be hereto affixed this _____ day of _____, 20__.

Signed, Sealed and Delivered
in the presence of or
attested by

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
INC. AS NOMINEE FOR AMERICAN MORTGAGE
NETWORK, INC.

SIGNER 1

(Signature w/ seal)

**Stacy E. Spohn    Vice President**
Print Name & Title

SIGNER 2

(Signature)

**Beth Cottrell    Assistant Secretary**
Print Name & Title

M CLAIRE FRENCH, CITY CLK.
MONMOUTH COUNTY, NJ
INSTRUMENT NUMBER
2009025776
RECORDED ON
Mar 17, 2009
11:15:03 AM
BOOK: OR-8762
PAGE: 1598
Total Pages: 2
COUNTY RECORDING FEES    $50.00
TOTAL PAID    $50.00

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2000, All rights reserved

**NJ ALL-PURPOSE**
**CERTIFICATE OF ACKNOWLEDGMENT**

State of **Ohio**        :

County of **Franklin**        :

On this _____ day of _____, 2009 before the undersigned notary appeared
(SIGNER 1 PRINT NAME)     **Stacy E. Spohn**     and (SIGNER 2 PRINT NAME)     **Beth Cottrell**     , proved to me
on the basis of satisfactory evidence to be the person(s) whose names(s) is are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury that the foregoing paragraph is true and correct.

Sworn to and subscribed before me this _____ day of Mar, 2009.

SIGNATURE OF NOTARY: _____

PRINTED NAME: Jennifer M Jacoby

JENNIFER M. JACOBY
Notary Public, State of Ohio
My Commission Expires 05-26-2012

**\*\* SIGNATURE OF SIGNERS REQUIRED BELOW FOR RECORDING.**

**CAPACITY(IES) CLAIMED BY SIGNER:**

Signatures:     (1) _____     (2) _____

              **Vice President**          **Assistant Secretary**

Titles:     (1) _____     (2) _____

Signer is
representing:     MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR AMERICAN MORTGAGE
                 NETWORK, INC.

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003. All rights reserved.
Inst. # 2014048109 - Page 1 of 5

## Monmouth County Document Summary Sheet

MONMOUTH COUNTY CLERK
PO BOX 1251
MARKET YARD
FREEHOLD NJ 07728

| Transaction Identification Number | 2226005 | 1455383 |
|---|---|---|

**Recorded Document to be Returned by Submitter to:**

EPN

400 SECOND AVE S

MINNEAPOLIS, MN 55401

**Official Use Only**

| | |
|---|---|
| Submission Date *(mm/dd/yyyy)* | 06/23/2014 |
| No. of Pages *(excluding Summary Sheet)* | 3 |
| Recording Fee *(excluding transfer tax)* | $60.00 |
| Realty Transfer Tax | $0.00 |
| Total Amount | $60.00 |

M CLAIRE FRENCH, CTY CLK
MONMOUTH COUNTY, NJ

INSTRUMENT NUMBER
2014048109
RECORDED ON
Jun 23, 2014
9:31:03 AM
BOOK:OR-9070 PAGE:364
Total Pages: 5

COUNTY RECORDING FEES    $60.00
TOTAL PAID               $60.00

| Document Type | ASSIGNMENT/MORTGAGE |
|---|---|

**Electronic Recordation Level**

L2 - Level 2 (With Images)

**Municipal Codes**

HOLMDEL                                    2001

**Bar Code(s)**

**Additional Information (Official Use Only)**

*\* DO NOT REMOVE THIS PAGE.*
*COVER SHEET [DOCUMENT SUMMARY FORM] IS PART OF MONMOUTH COUNTY FILING RECORD.*
*RETAIN THIS PAGE FOR FUTURE REFERENCE.*

Page 1 of 2

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2003, All rights reserved.
Inst. # 2014048109 - Page 2 of 5

## Monmouth County Document Summary Sheet

| Type | ASSIGNMENT/MORTGAGE | | | | |
|---|---|---|---|---|---|
| Consideration | | | | | |
| Submitted By | EPN (ERECORDING PARTNERS NETWORK, LLC) | | | | |
| Document Date | 02/28/2014 | | | | |
| Reference Info | | | | | |
| Book ID | Book | Beginning Page | Instrument No. | | Recorded/File Date |
| OR | 8443 | 1637 | 2005035713 | | 01/01/1900 |

| ASSIGNMENT/M ORTGAGE | MORTGAGOR | Name | | Address | |
|---|---|---|---|---|---|
| | | REZA FARZAN | | | |
| | | CHASE HOME FINANCE LLC | | | |
| | ASSIGNEE | Name | | Address | |
| | | BAYVIEW LOAN SERVICING LLC | | | |

| Parcel Info | | | | | |
|---|---|---|---|---|---|
| Property Type | Tax Dist. | Block | Lot | Qualifier | Municipality |
| | 20 | 58.04 | 31 | | 2001 |

*DO NOT REMOVE THIS PAGE.*
*COVER SHEET [DOCUMENT SUMMARY FORM] IS PART OF  MONMOUTH COUNTY FILING RECORD.*
*RETAIN THIS PAGE FOR FUTURE REFERENCE.*

Page 2 of 2

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.
Inst. # 2014046109    Page 2 of 3

We certify that this is a true and
correct copy of the original hereof.
PEIRSONPATTERSON, LLP

After recording please return to:
PEIRSONPATTERSON, LLP
ATTN: RECORDING DEPT.
13750 OMEGA ROAD
DALLAS, TX 75244-4505

Prepared by:

Law Office of Adam W. Scheinbach
Adam Scheinbach
2500 Johnson Avenue, Suite 8J
Bronx, New York 10463
917-406-9846
PEIRSONPATTERSON, LLP
WILLIAM H. PEIRSON
13750 OMEGA ROAD
DALLAS, TX 75244-4505
800-899-9027

—————————————— [Space Above This Line For Recording Data] ——————————————

# NEW JERSEY ASSIGNMENT OF MORTGAGE

For Value Received, JPMorgan Chase Bank, N.A., S/B/M Chase Home Finance LLC, the undersigned holder of a Mortgage (herein "Assignor") does hereby grant, sell, assign, transfer and convey, unto Bayview Loan Servicing, LLC, (herein "Assignee"), whose address is 4425 Ponce de Leon Blvd., Coral Gables, FL 33146, a certain Mortgage dated February 14, 2005 and recorded on March 8, 2005, made and executed by REZA FARZAN, to and in favor of AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION, upon the following described property situated in MONMOUTH County, State of New Jersey:
Property Address: 23 TWIN TERRACE, HOLMDEL, NJ 07733

See exhibit "A" attached hereto and made a part hereof.

such Mortgage having been given to secure of U.S. Three Hundred Fifty Nine Thousand Six Hundred Fifty and 00/100ths ($359,650.00), which Mortgage is of record in Book, Volume, or Liber No. Liber OR-8443, at Page(s) 1637 (or as No. 2005035713), in the Office of the Register of Deeds and Mortgages of MONMOUTH County, State of New Jersey.

TO HAVE AND TO HOLD, the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Mortgage.

New Jersey Assignment of Mortgage
JPMorgan Chase Bank N.A. Project W2799          Page 1 of 2          L73108NJ 01/12 Rev. 02/14

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on
**2-28-2014**.

Assignor:
JPMorgan Chase Bank, N.A., S/B/M Chase Home Finance LLC

By: _Adriane C. Matthews_
ADRIANE C. MATTHEWS
Vice President

Its: _____

## ACKNOWLEDGMENT

State of Louisiana    §
§
Parish of Ouachita    §

On this **28th** day of **FEBRUARY 2014** before me appeared **ADRIANE C. MATTHEWS**, to me personally known, who, being by me duly sworn (or affirmed) did say that he/she is the **VICE PRESIDENT**, of JPMorgan Chase Bank, N.A., S/B/M Chase Home Finance LLC, and that the seal affixed to said instrument is the corporate seal of said national association and that the instrument was signed and sealed on behalf of the national association by authority of its board of directors and that **ADRIANE C. MATTHEWS** acknowledged the instrument to be the free act and deed of the national association.

Signature of Officer

**TOMMIE J. NELSON**
Printed Name

Tommie J. Nelson
Notary I.D. #067566
Lincoln Parish, Louisiana
Commissioned for Life

**NOTARY PUBLIC**
Title of Officer

(Seal)

My Commission Expires:    **LIFETIME**

New Jersey Assignment of Mortgage
JPMorgan Chase Bank N.A. Project W2799        Page 2 of 2        L73108NJ 01/12 Rev. 02/14

Documents provided by DataTree LLC via it's proprietary imaging and delivery system Copyright 2003, All rights reserved.
INST. # 2014048168    Page

EXHIBIT "A"

ALL that certain lot, parcel or tract of land, situate and lying in the Township of Holmdel, County of Monmouth and State of New Jersey being more particularly described as follows:

BEING known and designated as Lot 30 in Block 58.04 as shown on map entitled *"Final Subdivision Plat Twin Acres Section Five"* duly filed in the Monmouth Clerk's/Register's Office on August 5, 1985 as Case No. 201-23.

Being further and more particularly bound and described as follows:

BEGINNING at a point in the Northerly sideline of Twin Terrace (50' ROW), said point being the Southerly most corner of Lot 31 in Block 58.04 as shown on map entitled *"Final Subdivision Plat Twin Acres Section Five"* duly filed in the Monmouth Clerk's/Register's Office on August 5, 1985 as Case No. 201-23; from thence running

(1)  North 14 degrees 41 minutes 40 seconds East, 82.62 feet to a point; thence

(3)  South 73 degrees 35 minutes 04 seconds East, 128.133 feet to a point in the Westerly sideline of Prospect Street; thence

(4)  Southwesterly, along the same, on a curve to the right having a radius of 312.82 feet, an arc length of 41.22 feet to a point of tangency therein; thence

(5)  Along the same, South 23 degrees 09 minutes 33 seconds West, 40.70 feet to a point of curvature; thence

(6)  Southwesterly, on a curve to the right having a radius of 15.00 feet, an arc length of 23.56 feet to a point in the Northerly sideline of Twin Terrace; thence

(7)  Along the same, North 66 degrees 50 minutes 27 seconds West, 103.00 feet to the point and place of BEGINNING.

After Recording Return to:

Wilmington Trust, N.A.
Sophie B. Pendolino
Assistant Vice President
Document Custodian
693 Seneca St., 4th Floor
Buffalo, NY 14210

*[Space Above This Line For Recording Data]*

## HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I")[1]:  REZA FARZAN

Lender or Servicer ("Lender"):  Bayview Loan Servicing, LLC

Date of first lien Security Instrument ("Mortgage") and Note ("Note"):  02/14/2005

Loan Number:  ███████████

Property Address ("Property"):  23 TWIN TERRACE HOLMDEL, NJ  07733

If my representations and covenants in Section 1 continue to be true in all material
respects, then this Home Affordable Modification Agreement ("Agreement") will, as set
forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the
Note secured by the Mortgage. The Mortgage and Note together, as they may
previously have been amended, are referred to as the "Loan Documents." Capitalized
terms used in this Agreement and not defined have the meaning given to them in Loan
Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the
Lender will send me a signed copy of this Agreement. This Agreement will not take
effect unless the preconditions set forth in Section 2 have been satisfied.

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I".
For purposes of this document words signifying the singular (such as "I") shall include the plural (such as
"we") and vice versa where appropriate.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT  - Single Family  - Fannie Mae / Freddie Mac  UNIFORM
INSTRUMENT Form 3157   3/09 (rev. 10/10)  V 1.6  Loan No.███████      *(Page 1 of 9 pages)*

1. **My Representations and Covenants**. I certify, represent to Lender, covenant and agree:

   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B. One of the borrowers signing this Agreement lives in the Property as a principal residence, and the Property has not been condemned;

   C. There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

   D. I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification Program ("Program"));

   E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

   F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

   G. I have made or will make all payments required under a trial period plan.

   H. I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

   A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan

Documents; and

B. I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

### 3. The Modification.

If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 08/01/2015 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a trial period plan, this modification will not take effect. The first modified payment will be due on 08/01/2015.

A. The new Maturity Date will be: 07/01/2055.

B. The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be $ 511,647.67  (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C. $ 75,600.00 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and I will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $ 436,047.67 . Interest at the rate of 2.000% will begin to accrue on the Interest Bearing Principal Balance as of 07/01/2015 and the first new monthly payment on the Interest Bearing Principal Balance will be due on 08/01/2015. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|------------------------------------------|-----------------------|-------------------|----------------------------|
| 1-5 | 2.000% | 07/01/2015 | $1,320.46 | $873.76 | $2,194.22 | 08/01/2015 | 60 |
| 6 | 3.000% | 07/01/2020 | $1,534.07 | Adjust Annually | Adjust Annually | 08/01/2020 | 12 |
| 7-40 | 4.000% | 07/01/2021 | $1,759.55 | Adjust Annually | Adjust Annually | 08/01/2021 | 408 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest being added to the outstanding principal balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.  I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

4.  **Additional Agreements.** I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-

borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B. That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and require-ments of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. **Funds for Escrow Items.** I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents;  (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items.". I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D.  I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items.  Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.

My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents.  If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount.  Lender may

revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E. That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly

modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I. That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT  - Single Family  - Fannie Mae / Freddie Mac  UNIFORM INSTRUMENT Form 3157   3/09 (rev. 10/10)  V 1.6  Loan No. ▬▬▬▬                    (Page 7 of 9 pages)

the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

L. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT  - Single Family  - Fannie Mae / Freddie Mac  UNIFORM
INSTRUMENT Form 3157   3/09 (rev. 10/10)  V 1.8  Loan No.: ███████                    (Page 8 of 9 pages)

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

IN WITNESS WHEREOF, the Lender and I have executed this Agreement.

**Borrower:**

By: _____    Date: 7/27/15
REZA FARZAN

**Non-Obligor:**

Non-Obligor Owner or Non-Obligor Spouse (signing solely in connection with any interest held in the Property, as defined above): _____
_____ ("Non-Obligor"), residing at: _____
_____

By: _____    Date: _____
Print Non-Obligor Name

**Lender:**

By: _____    Date: 1.5.16
Bayview Loan Servicing, LLC    Ernesto Irurzun

Asset Manager: Dawn Killen
Phone Number: (855) 295-3327 Monday - Friday 8:30 a.m. - 8:00 p.m., ET
Fax Number: (305) 631-6152

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT  - Single Family  - Fannie Mae / Freddie Mac  UNIFORM
INSTRUMENT Form 3157  3/09 (rev. 10/10)  V 1.6  Loan No.▮▮▮▮▮▮    (Page 9 of 9 pages)

NOTARY ACKNOWLEDGEMENT

STATE OF _New Jersey_ )

COUNTY OF _Monmouth_ ) SS
)

On _July 27, 2015_ , before me, _Samantha Dickie_ a notary
public for and within the said county, personally appeared, _Reza Farzan_
_____ , as the Borrower(s), personally
known to me *(or proved to me on the basis of satisfactory evidence)* to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) on the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

SAMANTHA DICKIE
Notary Public
State of New Jersey
My Commission Expires Feb 26, 2019

By: _Samantha Dickie_
Notary Public: _____
My Commission Expires: _02/26/2019_

Servicer:

Bayview Loan Servicing, LLC

By: _____

_____ERNESTO IRURZUN_____, Vice President
(Type in Name of Signatory)

STATE OF FLORIDA          ):

COUNTY OF BROWARD          ):

On ___1/5/16___ [date], before me, __HILDA A. PONCE__ [insert name of Notary Public], a Notary Public for and within the said county, personally appeared, __ERNESTO IRURZUN__ [insert name of signatory], Vice President of Bayview Loan Servicing, LLC, who's address is 4425 Ponce De Leon Blvd., 5th Floor, Coral Gables, Florida 33146, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

By: _____
(Signature of person taking acknowledgment)

HILDA A PONCE
MY COMMISSION # FF221185
EXPIRES April 15, 2019
FloridaNotaryService.com

_____HILDA A. PONCE_____
(Name typed, printed or stamped), Notary Public

_____FF221185_____
(Serial/Commission Number, if any)

_____April 15, 2019_____
(Commission Expiration Date)

After Recording Return to:

Wilmington Trust, N.A.
Sophie B. Pendolino
Assistant Vice President
Document Custodian
693 Seneca St., 4th Floor
Buffalo, NY 14210

## Modification Bankruptcy Disclosure Rider

THIS MODIFICATION BANKRUPTCY RIDER, effective December 23, 2015, is incorporated into and shall be deemed to amend and supplement the Loan Modification Agreement of the same date made by REZA FARZAN ("Borrower") and **Bayview Loan Servicing, LLC**, (the "Servicer") covering the property described in the Loan Modification Agreement located at: **23 TWIN TERRACE, HOLMDEL, NJ 07733.**

In addition to the covenants and agreements made in the Loan Modification Agreement, the Borrower and Lender covenant and agree as follows:

Borrower represents that Borrower was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Note and Security Instrument. Borrower and acknowledge and agree that the Loan Modification Agreement does not affect the discharge of the Borrower's Personal liability on the debt.

**Borrower:**

By: _____    Date: 12/31/2015
REZA FARZAN

Ernesto Irurzun

By: _____    Date: 1.5.16
Bayview Loan Servicing, LLC

AM529  V 1.0 Loan No